

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ENTERED
08/03/2011

| | | |
|---|---|---|
| IN RE: § | | |
| DUANE IRVIN MUHS; dba D&M § | Case No. 09-10564 | |
| BUILDING SERVICES, INC, § | | |
|     Debtor(s). § | | |
| § | Chapter 7 | |
| § | | |
| TRAVIS SANDERS, § | | |
|     Plaintiff(s) § | | |
| § | | |
| VS. § | Adversary No. 10-01008 | |
| § | | |
| DUANE IRVIN MUHS, § | | |
|     Defendant(s). § | Judge Isgur | |

## MEMORANDUM OPINION

Duane Muhs owes Travis Sanders $185,435.55 in principal and interest and $69,166.50 in legal fees. The debt is nondischargeable under §§ 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code.

## Bankruptcy Court's Authority

The Supreme Court's recent decision in *Stern v. Marshall* recognized significant limitations on bankruptcy courts' authority. No. 10-179, 564 U.S. ---, 2011 WL 2472792 (June 23, 2011). The Bankruptcy Court therefore provides analysis of its authority in this case.

*Stern* concerned a bankruptcy court's authority over a debtor's common-law counterclaim to a proof of claim filed against the estate. The Supreme Court held that a bankruptcy court may not constitutionally enter a final judgment over a counterclaim that would not necessarily be resolved by the resolution of the proof of claim. *Id.* at *24. The counterclaim did not constitute a "public rights" dispute. *Id.* at *21. Although public rights disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related

to a particular federal government action." *Id.* at *17-18. Entering a final judgment with respect to the counterclaim would be an impermissible exercise of the judicial power of the United States. *Id.* at *21.

The broader applicability of the Court's decision remains unclear. Other types of disputes frequently decided by bankruptcy courts may also require adjudication by an Article III court. *Granfinanciera, S.A. v. Nordberg*, for example, held that the adjudication of a fraudulent transfer claim against a creditor who had not filed a proof of claim did not fall within the public rights exception. 492 U.S. 33, 54-55 (1989). Following *Stern*, it is unclear whether the adjudication of a fraudulent transfer claim against a creditor who *has* filed a proof of claim falls within the public rights exception. The Court's authority over matters involving state-law causes of action is particularly questionable.

The Court concludes, however, that it may exercise authority over essential bankruptcy matters under the "public rights" exception. Under *Thomas v. Union Carbide Agricultural Products Co.*, a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal. 473 U.S. 568, 593 (1985). The Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including "the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." *Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363-64 (2006); *see Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (noting in dicta that the restructuring of debtor-creditor relations "may well be a 'public right'"). *But see Stern*, 2011 WL 2472792, at *20 n.7 ("We noted [in

*Granfinanciera*] that we did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'").

At least two overlapping classes of claims fall within the Court's constitutional authority: (1) matters invoking only the Court's *in rem* jurisdiction over the bankruptcy estate and (2) disputes over rights created by the Bankruptcy Code as an integral part of the public bankruptcy scheme. Because exclusive jurisdiction over the debtor's property is one of the "[c]ritical features" of a bankruptcy proceeding, matters invoking only the Bankruptcy Court's *in rem* jurisdiction fall within the public rights exception. *Katz*, 546 U.S. at 363. Additionally, under *Thomas*, rights created by the Bankruptcy Code and integral to the public bankruptcy scheme fall within the public rights exception.

This case involves a dispute over Muhs' discharge. The right to a discharge is established by the Bankruptcy Code and is central to the public bankruptcy scheme. *See id.* (including a discharge among the critical features of a bankruptcy proceeding). A debtor, upon surrendering his or her assets for distribution in a chapter 7 case, is entitled to a discharge. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("A bankruptcy court is able to provide the debtor a fresh start in this manner . . . because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors."). Determinations of whether a debtor meets the conditions for a discharge are integral to the bankruptcy scheme, and the Bankruptcy Court has the authority to make such determinations.

Similarly, the Bankruptcy Court has the authority to determine when the statutorily established right to a discharge does *not* apply. Unless a creditor proves the applicability of an exception to discharge, the creditor is entitled to collect only against the bankruptcy estate. *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 F. App'x 943, 945 (5th Cir. 2009) ("[T]he

creditor claiming nondischargeability . . . has the burden of proving, by a preponderance of the evidence, that the debt is exempt from discharge."). When a bankruptcy court determines the extent of a creditor's nondischargeable claim, the court simply decides that a particular creditor is entitled to something more than the creditor would otherwise get out of the bankruptcy bargain. Such determinations are inextricably tied to the bankruptcy scheme and involve the adjudication of rights created by the Bankruptcy Code. This case therefore falls within the Bankruptcy Court's authority, and the Bankruptcy Court's judgment is final.

Moreover, a bankruptcy court may determine the amount of the debt that is excepted from discharge. *In re Morrison,* 555 F.3d 473 (5th Cir. 2009). As set forth in more detail below, in the present case the determination of the amount is integral to the determination of the exception itself. *See Stern* at *24 ("[T]he question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.").

### Findings of Fact

Around 2006-2007, Sanders decided to build a restaurant on South Padre Island, Texas. Sanders and his brother-in-law, Ron Guillot, agreed that Sanders would build and own the property, and Guillot would own and operate the restaurant, Parrot Eyes. Sanders hired D&M Building, Muhs' construction company, to act as the general contractor for the project.

On August 18, 2007, Sanders and Muhs entered into a cost-plus contract for the construction of the Parrot Eyes restaurant building. Under the contract, Muhs would be paid the actual costs of the construction, plus a set profit margin of 15%. Pl's Ex. 1, at 2. Muhs estimated that construction of the restaurant would cost $1,887,438.00 and would be completed around April 1, 2008. *Id.*

The deadline for the completion of the project came and went several times. Muhs periodically submitted draw requests, and Sanders advanced money to cover the costs of construction. By late 2008, Sanders had advanced over $2 million on the project. Pl's Ex. 5, at 1. On December 17-18, 2008, Sanders, who lives in Fort Worth, Texas, met with Muhs on South Padre Island to discuss the progress of the construction and the mounting construction costs. Muhs had misapplied some of the previous draw requests, and he told Sanders that he needed additional cash to pay vendors and subcontractors. Muhs told Sanders that he was short on cash because some of Muhs' other building projects were not paying, and Muhs had used Sanders' money to pay expenses on those projects. Muhs borrowed $176,000.00—the amount he said was needed that was in excess of the amounts that he could legitimately draw under the contract—from Sanders to pay the vendors and subcontractors. Muhs also stated that he would finish the project by January 31, 2009. Sanders did not expect any further draw requests after January 31, 2009.

Muhs executed a promissory note ("Note") on December 18, 2008, agreeing to pay $185,435.55 in principal and interest to Sanders on June 30, 2009. Pl's Ex. 2, at 1-2. Sanders loaned the money under specific conditions. First, he asked Muhs to show him financial statements, including balance sheets, reflecting the financial condition of D&M Building. Second, he required Muhs to sign written representations regarding his financial condition, including his ownership of several vehicles. Finally, Sanders required Muhs to sign a security agreement granting Sanders a security interest in Muhs' accounts, equipment, inventory, proceeds and products, books and records, customer lists, credit files, and other collateral. Pl's Ex. 3, at 1, 3.

Muhs represented that he had good and valid title to all the collateral listed in the security agreement. Pl's Ex. 3, at 4. The collateral included numerous vehicles, which were listed on a schedule attached to the security agreement. Pl's Ex. 3, at 14. The schedule represented that all of the vehicles were located at D&M Building's business location and that none of the vehicles were subject to liens. *Id.* Sanders also examined D&M Building's balance sheets, Pl's Exs. 18 & 19, to determine the financial condition of the company. The total value of the vehicles on the balance sheets was close to the value of the promissory note, and Sanders believed that he was fully collateralized.

The balance sheets also indicated that Gabriella's Restaurant owed D&M Building over $1.1 million dollars. Pl's Ex. 19, at 1. Sanders believed that the $1.1 million represented an asset of D&M Building, and he relied on that belief. However, Sanders later discovered that Gabriella's Restaurant was owned, through an entity called Tiamo, by Muhs and his wife.[1]

Kirk Owens, an employee of D&M Building, explained that the $1.1 million loan to Gabriella's had been reported as a receivable on D&M Building's balance sheet. However, because there was no contract between D&M Building and Gabriella's, the IRS had, after auditing Muhs' business entities, required Muhs to treat loans to Gabriella's as personal distributions. When Sanders viewed the balance sheet, he assumed that the $1.1 million loan receivable represented an actual asset and that Muhs had equity of $1.7 million in D&M Building. Sanders loaned money to Muhs based on this assumption.

Sanders also later discovered that Muhs had loaned $176,000.00 to Gabriella's to fund a buildout of Gabriella's new location on South Padre Island, where it would be a direct

---

[1] Muhs testified at trial that he did not own any interest in Tiamo. The Court does not find this testimony plausible. Muhs admitted in his deposition that he owned an interest in Tiamo and listed an interest in Tiamo on his bankruptcy schedules.

competitor to Parrot Eyes. Sanders testified at trial that if he had been aware that Muhs would loan money to a competing restaurant, he would not have loaned $176,000.00 to Muhs.

Additionally, Sanders discovered that Muhs had submitted incorrect reimbursement amounts on the draw requests. The All Transactions Report, a spreadsheet produced by Muhs, shows all of the income and expenses for the Parrot Eyes project as of January 2, 2009. Many of the reported expenses are clearly inaccurate. For example, Muhs allegedly incurred expenses of $45,789.00 to Rio Elevator. Pl's Ex. 5, at 37. Although an elevator was planned, none was ever purchased or installed in the Parrot Eyes building. Muhs also allegedly incurred expenses of $80,140.00 to D&T Construction for asphalt. The building has a concrete parking lot.[2] Sanders also discovered that many of the charges—approximately $41,000.00—on the draw requests were for equipment rentals from Garcia Equipment Rentals. Garcia Equipment Rentals, Sanders later learned, is owned by Muhs. Some charges, Sanders discovered, had been incurred but not actually paid by Muhs, including $26,600.00 to Allied Fire Protection. Sanders also believed that some charges from White Lumber had not actually been incurred for Parrot Eyes.

Sanders stopped sending money on draw requests after January 2, 2009. He never told Muhs that he did not intend to advance more money. Instead, Sanders misrepresented to Muhs that Sanders was short of money. Muhs continued to perform work on the construction site. Muhs testified at trial that he incurred $144,532.79 in expenses after January 3, 2009.

On January 9, 2009, Sanders and Muhs signed an amendment to the cost-plus contract, setting a fixed cost for Muhs' construction work. Pl's Ex. 4. Under the amended agreement,

---

[2] The All Transactions Report also indicates a charge from D&T Construction of $15,000.00 for "Change Order: Asphalt to Concrete." Pl's Ex. 5, at 9. Muhs appears to have kept the estimated cost of an asphalt parking lot on the spreadsheet even after he decided to build a concrete parking lot instead.

Sanders was obligated to pay Muhs at a fixed rate of $240,000.00 for his services, in addition to reimbursing the costs of construction. *Id.*

Muhs never repaid the money he owed to Sanders. Additionally, Muhs auctioned off the vehicles that had served as collateral, even after Sanders' attorney informed Muhs' attorney that the vehicles were subject to a security agreement and requested that proceeds from the auction be placed in escrow. Pl's Ex. 21. The proceeds were not placed in escrow.

On October 5, 2009, Muhs filed a voluntary chapter 7 bankruptcy petition. Sanders filed this adversary proceeding on March 26, 2010, seeking to have the debt on the Note declared nondischargeable under § 523(a)(2)(A) for false statements, false pretenses, or actual fraud; under § 523(a)(2)(B) for false statements in writing regarding financial condition; under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity; and under § 523(a)(6) for willful and malicious injury. Trial was held on May 16-17, 2011, and closing arguments were heard on June 1, 2011.

## Analysis

### 1. Section 523(a)(2)(A)

The debt is nondischargeable under § 523(a)(2)(A). For a debt to be nondischargeable under section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance. *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

When Sanders loaned the $176,000.00 to Muhs in December 2008, Sanders intended to ensure that the Parrot Eyes project would be promptly completed. He was unaware that Muhs

had overstated the expense amounts on the draw requests and that any cash shortage was the result of Muhs' diversion of funds out of the Parrot Eyes project and to a direct competitor that was owned by Muhs and/or Muhs' wife. Muhs represented to Sanders that Muhs needed cash because some of D&M Building's other projects were not paying. Sanders was unaware that Muhs was transferring funds to his own competing restaurant, Gabriella's. Had Sanders been aware of the overstated expenses and the diversions, he would not have made the loans.

Sanders actually and justifiably relied on the representations on the draw requests. However, the draw requests contained numerous charges that were inaccurate. At the time of the loan, Sanders had already paid over $2 million on the basis of the draw requests. If Sanders had known that many of the expenses were overstated, he would not have loaned additional money to Muhs, especially not for the purpose of making up a deficiency created by Muhs' diversion of funds.

Sanders' reliance was justifiable. Although he could have examined the expenses more carefully, he was not unjustified in assuming that the draw requests were accurate. *See Field v. Mans*, 516 U.S. 59, 70, 74-75 (1995) (holding "that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance" and noting that "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'") (quoting Restatement (Second) of Torts (1976) § 540)).

Sanders also actually and justifiably relied on Muhs' representations that the reason for the shortage was that Muhs' other projects were not paying. Muhs' explanation was plausible, and Sanders' acceptance of the explanation was justifiable. If Sanders had known that Muhs was making major cash transfers—one in the amount of $176,000, the same amount as Sanders'

loan—to Gabriella's, a competing restaurant owned by Muhs and/or Muhs' wife, Sanders would not have advanced money to Muhs. Trial Tr. 48, May 16, 2011.

Muhs made the misrepresentations regarding the earlier expenses and the reason for the shortage in cash with the intent to deceive Sanders. The earlier misrepresentations on the draw requests and diversion of funds are evidence that Muhs was behaving dishonestly toward Sanders. He was short on funds because of his pattern of diverting funds from Sanders' project. In order to obtain the loan and cover up the earlier deceptions, Sanders made more false representations.

Because of his reliance on Muhs' intentional misrepresentations, Sanders suffered the loss of the amount owed on the Note and the legal fees involved in bringing this case. The elements of § 523(a)(2)(A) are satisfied, and Muhs' debt to Sanders is nondischargeable.

## 2. Section 523(a)(2)(B)

The debt is nondischargeable under § 523(a)(2)(B) because Sanders made the loan in reliance upon Muhs' written misrepresentations regarding Muhs' financial condition.

Under § 523(a)(2)(B), a debt is nondischargeable when the debtor obtained money, property, services, or credit by use of a statement in writing (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor reasonably relied; and (4) that the debtor caused to be made or published with intent to deceive. *Norris v. First Nat'l Bank in Luling (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).

Muhs obtained $176,000.00 by making materially false statements in writing regarding his financial condition. Muhs provided materially false information regarding the collateral. The security agreement, Pl's Ex. 3, at 4, falsely represented that Muhs had good and valid title to all the vehicles listed on the attached schedule, Pl's Ex. 3, at 14. The attached schedule also

falsely represented that all the vehicles were located at D&M Building's business location. In fact, Muhs did not even know where some of the vehicles were located or whether they were operable. One of the vehicles had already been sold to a person named Oscar Hernandez. Another of the vehicles was subject to a lien. One or two had been junked, but Muhs still had title to them. Muhs did not disclose these facts to Sanders: "I admit that I gave my entire notebook of titles to Mr. Sanders. And there was one or two of them that had been junked that I still had the title to. I admit that." Trial Tr. 174, May 16, 2011.

Muhs also provided materially false balance sheets for D&M Building. The balance sheets indicated that D&M Building's assets included a $1.1 million loan receivable from Gabriella's. Because the receivable was due from another entity owned by Muhs that did not have the ability to repay the $1.1 million, the $1.1 million did not constitute a real asset. Although the balance sheet was not required, under state law, to conform to IRS standards, Muhs was required to provide accurate information to Sanders. Sanders' concern was not for the technical state of D&M Building's balance sheet, but for Muhs' actual financial condition, and Muhs was well aware of this concern. Showing the $1.1 million receivable without disclosing that the loan was not collectible was a material misrepresentation of Muhs' financial condition. *See Colo. E. Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550, 559 (Bankr. D. Colo. 2009) (holding that omission of guaranty obligations of $2.8 million, leading creditor to believe that debtor's net worth was $2.7 million, was a material misrepresentation under § 523(a)(2)(B)).

Sanders relied on the false written representations of Muhs' financial condition when he loaned the $176,000.00. Sanders testified that it was important to him that the debt would be fully collateralized, and he would not have loaned $176,000.00 if he had known that Muhs did not own all the vehicles free and clear of all other liens. Trial Tr. 40-41, 44, May 16, 2011.

Moreover, he relied on the written representations that Muhs owned approximately $1.7 million in equity in D&M Building.  Trial Tr. 45, May 16, 2011.

Muhs provided the written misrepresentations with the intent to deceive Sanders. Sanders could not explain the misrepresentations regarding the cars.  At trial, when confronted with his deposition testimony, he first admitted that he had not had clear title to all of the cars when he granted the security interest to Sanders.  When confronted with his false representation that the vehicles were all location at D&M Building's business location, he explained, "But I—everybody knew where my vehicles were."  Trial Tr. 173, May 16, 2011.  He was also aware that one or two of the vehicles had already been junked.  Trial Tr. 174, May 16, 2011.  Muhs is experienced in the construction business and should have been aware that this information would be relevant.  It is not plausible that his misrepresentations and failures to disclose were accidental.  Later he asserted, "I gave Mr. Sanders titles to all of those vehicles.  And they did not have any liens on them."  Trial Tr. 183, May 16, 2011.  The Court finds these explanations implausible and concludes that Muhs intended to deceive Sanders.

Muhs also intended to deceive Sanders by providing misleading balance sheets. Although Muhs did not prepare the balance sheets, he provided them to Sanders and knew that the information regarding the Gabriella's receivable was misleading.  He also knew or should have known that the omitted facts about the uncollectable insider receivable would have been relevant to Sanders.

Muhs' intent to deceive can also be inferred from other facts.  First, as discussed above, Muhs' submission of inaccurate draw requests is evidence that, at the point of the loan, he had diverted funds from the Parrot Eyes project.  Muhs' dishonesty about the purpose of the money

supports the inference that he intended to deceive Sanders when he provided misleading financial information.

Second, Muhs' loaning the same amount of money to Gabriella's is evidence of his intent to deceive Sanders. Although the identical amounts of the loans may be a coincidence, Kirk Owens' testimony that surplus funds from D&M Building were used to fund Gabriella's indicates that Muhs may have diverted Sanders' money to Gabriella's. In any case, Sanders did not use the money for the purpose he said he would—to pay vendors—and he may have used the fungible money to fund a competing restaurant.

Finally, Muhs' later auction of the collateral vehicles—and his disregard of Sanders' attorney's letter—also supports the inference that his intention at the time of the loan was dishonest. Muhs intended to deceive Sanders, and the debt is nondischargeable under § 523(a)(2)(B).

Because the debt is nondischargeable under §§ 523(a)(2)(A) and 523(a)(2)(B), the Court does not decide whether the debt is also nondischargeable under § 523(a)(4) for fraud and defalcation in a fiduciary capacity or under § 523(a)(6) for willful and malicious injury.

### *3. Calculation of Amount Owed*

Sanders established that Muhs owes $185,435.55 in principal and interest on the Note. He also established that the debt is nondischargeable under §§ 523(a)(2)(A) and 523(a)(2)(B). Muhs proved a potential right to an offset on the debt for the costs of the work performed after January 2, 2009. However, he did not prove that he is actually entitled to an offset.

Under the contract as amended on January 9, 2009, Muhs is entitled to reimbursement for the actual costs of construction plus a $240,000.00 profit margin. Any profit over $240,000.00 was to be returned to Sanders by March 7, 2009. Pl's Ex. 4, at 1.

As of January 2, 2009, according to the All Transactions Report, the total costs on the project were $1,810,103.56. Pl's Ex. 5, at 38. Sanders had forwarded $2,060,427.31 in addition to the $176,000.00 loan. The $176,000.00 loan did not represent additional costs; it was intended to cover a portion of the already-incurred $1.8 million in costs. Muhs was obligated to return the $176,000.00 (plus principal and interest) and to return any profit over $240,000.00. As of January 2, 2009, Muhs' profits were $250,323.80.

Sanders did not make any payments after January 2, 2009, and Muhs testified that he paid $144,532.79 in costs after January 3, 2009. Muhs' testimony regarding the additional $144,532.79 in costs was credible, and the Court notes that the costs were incurred based on Sanders' misrepresentations that additional advances would be forthcoming. If all of the statements were truthfully and accurately prepared, Muhs would be entitled to offset $134,209.04[3] against his debt to Sanders.

However, Sanders established that many of the expenses up to January 2, 2009— including the amounts allegedly paid to Rio Elevator and Garcia Rentals—were falsified or overstated. The alleged elevator costs, for example, were $45,789.00, and the alleged asphalt costs were $80,140.00. Sanders also billed $41,000.00 for rental costs with his own company, Garcia Rentals.

Sanders has not sued for additional recovery beyond the principal and interest on the Note plus legal fees. The Court therefore does not attempt to parse out the legitimacy of the various expenses included on the All Transactions Report, nor does the Court determine that the entirety of the $144,532.79 in costs, which Muhs allegedly incurred after January 3, 2009, was

---

[3] This amount is calculated by adding the $1,810,103.60 in expenses from the January 2, 2009 All Transactions Report, Pl's Ex. 5, the $144,532.79 in expenses incurred after January 3, 2009, and the $240,000.00 profit agreed upon in the January 9 amendment to the construction contract, and subtracting the $2,060,427.31 that Sanders paid to Muhs.

legitimate. The evidence is insufficient for precise conclusions. The evidence shows, however, that the amount of overstated expenses up to January 2, 2009 was at least equal to Muhs' potential $134,209.04 setoff. The Court therefore finds that Muhs is not entitled to a setoff.

The burden of proof for the setoff claim rested on Muhs. The setoff claim is entirely dependent on the allegation that the total amount spent on the project plus $240,000.00 exceeded the total paid by Sanders. Because Muhs cannot sustain his burden as to the accuracy of the All Transactions Report, the setoff claim necessarily fails.

### 4. Legal Fees

The Court awards $69,166.90 in legal fees. Ian Peck, attorney for Sanders, testified regarding the reasonableness of the legal fees. Sanders also filed invoices reflecting the fees and costs incurred through April 11, 2011. The total amount was $64,166.90.[4] Pl's Ex. 20. Peck testified that trial preparation and trial would be billed on top of that amount.

Peck said that work had been done by paralegals and associates to the extent possible, and that the firm had given discounts in this case. Sanders' invoices reflect the time spent, the rates of the professionals, and the general tasks completed. The Court finds that the invoiced fees are reasonable. Sanders did not provide an estimate of the pre-trial and trial expenses. The Court awards $5,000.00 in estimated pre-trial and trial fees and costs, for a total of $69,166.90. The awarded legal fees are part of the nondischargeable debt. *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) (holding that the amount of nondischargeable debt for fraud includes the legal fees associated with establishing fraud).

---

[4] Peck testified that he believed the legal fees up to April 11, 2011 were roughly $77,000.00. The invoices reflect only $64,166.90. The Court concludes that the invoices provide the more accurate figure.

15 / 16

**Conclusion**

Muhs owes Sanders $185,435.55 in principal and interest plus $69,166.90 in legal fees, and the debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).

SIGNED **August 2, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE